# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In Re: Dean J. Borstad<br><br>     Debtor. | Bankruptcy No.: 15-30013<br><br>Chapter 7 |
| Horizon Financial Bank,<br><br>     Plaintiff,<br><br>vs.<br><br>Dean J. Borstad,<br><br>     Defendant. | Adversary No.: 15-07008 |

## MEMORANDUM AND ORDER

Plaintiff Horizon Financial Bank filed a Complaint seeking denial of Debtor/Defendant Dean J. Borstad's bankruptcy discharge under 11 U.S.C. § 727(a)(2), (a)(3) and (a)(4). Specifically, Horizon alleges Debtor fraudulently transferred property within one year of his bankruptcy, failed to keep or preserve records from which his financial condition can be ascertained and made a false oath or account by undervaluing or failing to disclose assets in his petition and at the meeting of creditors.

Alternatively, Horizon seeks a determination that Debtor's debt to Horizon is excepted from discharge under 11 U.S.C. § 523(a)(2) and (a)(6). Horizon alleges Debtor fraudulently obtained money and an extension of credit using a written financial statement that he knew was false and on which Horizon relied. Horizon also alleges

Debtor willfully and maliciously injured Horizon by using the loan proceeds for personal expenses knowing it would leave him unable to repay his debt.

In his Answer, Debtor denied the allegations.

This adversary action is a core proceeding under 28 U.S.C. § 157(b)(2)(J). The Court has jurisdiction under 28 U.S.C. §§ 1334 and 157 and has authority to enter a final order in this matter. This opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

For the reasons that follow, Horizon's claims and causes of action are dismissed.

## I.   FACTUAL BACKGROUND

Debtor farmed near Cando, North Dakota, from 1989 to 2013. Like many farmers, Debtor swapped services and shared equipment with other farmers. For example, Debtor and Darin Weisz, who have known each other since 1999, exchanged farming services such as spraying, seeding and combining over the years. They also exchanged parts, seed, tools, equipment, materials and more. Debtor and Weisz also jointly owned an anhydrous applicator and a bat-wing mower. Weisz had possession of the applicator and mower the entire time Debtor and Weisz owned them. According to a hand-written accounting prepared by Debtor summarizing all of their debts, Weisz owed Debtor a total of $71,940, and Debtor owed Weisz a total of $85,250. Offsetting the debts, Debtor owed Weisz $13,310. To settle this debt, Debtor transferred his half interest in the mower (valued at $7,000) and his half interest in the anhydrous applicator (valued at $6,500) to Weisz in early 2015. Although the two discussed creating an

accounting for years, they finally "cleared up" their claims and debts in early 2015 because Weisz was "looking out for himself" after Debtor's divorce.[1]

Similarly, Ryan Miller combined for Debtor in 2007. Debtor gave Miller a cultivator worth $1,200 in exchange for his work. Another time, Miller harvested sunflowers for Debtor, who repaid this obligation by swathing for Miller. In the fall of 2013, Miller again combined for Debtor, and Debtor gave Miller and Miller's brother his one-third interest in a spreader that the three of them owned together.

Debtor owned a house in Cando, valued at $35,000. In 2010, Debtor and his farmhand, Jeremiah Masterson, agreed that if Masterson worked for Debtor for four years, Debtor would give Masterson the house in exchange for his work. Debtor transferred the house to Masterson in 2014.

### A.    2013 Operating Loan

Over the years,[2] Horizon granted numerous loans to Debtor for varying amounts and purposes ranging from the purchase of equipment to general operations. Debtor's 2013 farm operating loan, in particular, is central to the dispute in this case.

Debtor did not submit a written loan application for his 2013 operating loan. Rather, Bryan Anderson,[3] Debtor's principal contact and loan officer at Horizon since approximately 2000, prepared the documentation for the loan. Debtor met Anderson at

---

[1] Although Debtor's and Weisz's calculations regarding their respective debts are slightly different, each results in a remaining balance of approximately $200.

[2] Debtor was Horizon's client for more than 20 years.

[3] Anderson handles more than 50 clients for Horizon, most of whom are farmers or work in the agriculture industry. In addition to working for Horizon, Anderson is also a farmer.

Horizon on February 2, 2013, to prepare the documentation for his 2013 operating loan. Specifically, Anderson prepared a balance sheet, collateral analysis, risk report and executive summary using FINPACK.[4]

At trial, Anderson explained the process for generating the balance sheet. Together, Anderson and Debtor updated Debtor's balance sheet for Horizon's use in considering his request for a 2013 operating loan. The balance sheet includes a list of machinery and equipment. FINPACK carries forward the data from the previous year unless Anderson deletes or changes it. Anderson adds any new items each year. He testified that lenders routinely rely on the balance sheet in extending agricultural credit because it gives them a level of confidence that the borrower has the financial ability to repay the loan.

Debtor brought notes to their meeting,[5] and Anderson entered the numbers into the computer and compiled an updated balance sheet. According to Debtor, he and Anderson "went through some numbers." Anderson asked Debtor for estimates on prepaid expenses and crop inventory. Debtor claimed Anderson told him, "We can bring some of these numbers up and we can bring some down." Debtor stated this was so that the numbers would "look good for the bank." Debtor understood this to mean that they could adjust the numbers "so that the ratio turned out right so that [Anderson] could make the loan." He recalled Anderson stating, "We'll see how the numbers work out." Debtor also testified that he is not claiming that Anderson told Debtor to change

_____

[4] FINPACK is a credit analysis software program developed by University of Minnesota for creating financial statements, operating statements, cash flow statements and risk ratings. Banks across the nation use FINPACK.

[5] Anderson did not keep these notes in his file.

4

the numbers.  Anderson disputed Debtor's allegation that Anderson told Debtor he could adjust the figures on the balance sheet, testifying that he told Debtor nothing about the figures on the balance sheet.

Debtor reviewed the balance sheet before signing and dating it on February 2, 2013.  Debtor's 2013 balance sheet listed a net worth of $2,042,227.  His assets totaled $3,744,745.  Horizon did not independently verify any of the information on the balance sheet.

At trial, Anderson testified that he subsequently learned that some of the information in Debtor's 2013 balance sheet was not accurate because of equipment and grain inventory "discrepancies."  Anderson never doubted Debtor's information prior to 2013 or had reason to believe it was inaccurate.  Consistent with this testimony, Anderson's comment sheet, discussed below, contains no mention of any problem with Debtor's financial information.

Debtor acknowledged a number of errors and omissions on the balance sheet.  Specifically, Debtor's 2013 balance sheet included the house in Cando valued at $35,000.  Although Debtor owned the house in 2013 when the balance sheet was generated, the balance sheet did not show the liability to Masterson.  The balance sheet also included a Cessna airplane valued at $2,500 that Debtor no longer owned in 2013.  Additionally, the balance sheet listed $50,000 in miscellaneous tools and two welders.  Debtor testified that he never owned $50,000 of tools and welders. [6]  The balance sheet

---

[6] Debtor's 2012, 2013 and 2014 balance sheets all listed $50,000 in miscellaneous tools and two welders.

also listed three antique John Deere tractors, each valued at $8,000.[7]  Debtor claims he gave the tractors to his children as gifts, and the tractors should not have been included on his balance sheet.[8]  The balance sheet also included a fourth John Deere tractor, valued at $4,500, which Debtor no longer owned.  The balance sheet included a $40,000 account receivable owed by Darin Weisz, but does not include an account payable owed from Debtor to Weisz.

The 2012, 2013 and 2014 balance sheets also include crop inventory.[9]  During its examination of Debtor at trial, Horizon highlighted the crop inventory reported on the 2012 balance sheet by adding these figures to the 2012 and 2013 crop production estimates[10] he reported to Rural Community Insurance Company (RCIS) and comparing this data to delivery sheets and payment summaries showing the 2012 and 2013 crops Debtor sold.  In the "Borstad Crops Accounting Production and Sales Summary" Horizon prepared for demonstrative purposes, Horizon suggested that the crop inventory on the 2012 balance sheet (which represented 2011 crop yield that had not yet been sold on the date of the financial statement) added to production estimates

---

[7] Debtor's 2012, 2013 and 2014 balance sheets listed the three antique John Deere tractors.  Each tractor was listed with a value of $8,000 in the 2012 and 2013 balance sheets but with a value of $6,000 in the 2014 balance sheet.

[8] Neither party offered any evidence about when Debtor gave his children these tractors.

[9] The crop inventory section of the balance sheet dated January 17, 2012 referenced barley, spring wheat, soybeans and canola.  The crop inventory section of the balance sheet dated February 2, 2013 listed barley, spring wheat, soybeans and canola inventory.  The balance sheet dated March 13, 2014 listed only pinto beans.

[10] On at least two occasions during his testimony, Debtor emphasized that the crop production figures he reported to RCIS were his best estimates of the weight of the crops listed.

Debtor reported to RCIS totaled less than the total pounds and bushels he sold in 2012 and 2013.[11]  The summary, supported by underlying data, showed that the bushels of barley listed on the 2012 balance sheet added to barley bushels Debtor reported to RCIS in 2012 exceeded the barley he sold in 2012 and 2013 by 7,965.70 bushels. Wheat bushels reported on the 2012 balance sheet added to wheat bushels Debtor reported to RCIS in 2012 and 2013 exceeded wheat he sold in 2012 and 2013 by 11,143.94 bushels.  Soybeans listed on the 2012 balance sheet added to soybean bushels Debtor reported to RCIS in 2012 and 2013 exceeded the soybeans he sold in 2012 and 2013 by 15,173.95 bushels.  Canola reported on the 2012 balance sheet added to pounds of canola Debtor reported to RCIS in 2012 exceeded canola he sold in 2012 and 2013 by 749,423 pounds.

Debtor responded to this information by highlighting his 2011 crop sales, suggesting that while Horizon included 2011 crop production (or at least the part of 2011 yield included in inventory), it did not consider 2011 crop sales.  Debtor maintains that Horizon's arguments and demonstrative exhibit did not account for Debtor's sale of some of his 2011 crops in 2012 or 2012 crops in 2013.  According to the figures Debtor highlighted, supported by underlying data, the barley bushels he sold in 2011, 2012 and 2013 exceeded barley inventory reported on the 2012 balance sheet and production estimates he reported to RCIS in 2012 by 12,177.8 bushels.  Wheat bushels Debtor sold in 2011, 2012 and 2013 are less than wheat inventory he reported on the 2012 balance sheet and production estimates reported to RCIS in 2012 and 2013 by only

---

[11] The evidence shows Debtor did not produce barley, wheat, soybeans and canola in 2014 and sold crop inventory from previous years by the end of June 2014.

2,165.4 bushels.  Soybean bushels he sold in 2011, 2012 and 2013 exceeded soybean

inventory he reported on the 2012 balance sheet and production estimates he reported

to RCIS in 2012 and 2013 by 3,901.0 bushels.  Pounds of canola he sold in 2011, 2012

and 2013 exceeded canola inventory reported on the 2012 balance sheet and

production estimates he reported to RCIS in 2012 by 91,806 pounds.

Comparing crop production Debtor reported to RCIS to crops he sold from 2011

to 2013, Debtor's estimated crop production is very close to the crop sales:

| Year | Crop | Estimate Reported to RCIS | Sold |
|------|------|---------------------------|------|
| 2011 | Barley | 20,143.6 | 20,143.56 |
| 2011 | Wheat | 29,596.4 | 29,596.31 |
| 2011 | Soybeans | 28,007.7 | 28,352.67 |
| 2011 | Canola | 1,614,930 | 1,612,930 |
| 2012 | Barley | 18,778 | 25,812.3 |
| 2012 | Wheat | 44,086.34 | 44,095.5 |
| 2012 | Soybeans | 38,798.65 | 37,785.8 |
| 2012 | Canola | 948,792 | 949,369 |
| 2013 | Barley | 0 | 0 |
| 2013 | Wheat | 53,189.30 | 49,113.2 |
| 2013 | Soybeans | 4,919.6 | 5,758.5 |
| 2013 | Canola | 0 | 0 |

Debtor testified that Horizon received all the proceeds from the sale of his crops

regardless where they were sold.[12]  He explained that most of the time Horizon was

listed as a payee, but there were occasions when an elevator issued a check made

payable to Debtor only.  In those instances where Horizon's name did not appear on the

check, Debtor deposited the check at Horizon.  Debtor maintained that all the crops he

produced were sold and all the proceeds deposited at Horizon.  Horizon offered no

evidence to the contrary.

--------

[12] Horizon received many of the crop proceeds payments on or near the day
Debtor signed the 2012 and 2013 financial statements.

Anderson also prepared an executive summary that Debtor signed and dated on February 2, 2013.  Anderson testified that, as a routine practice, he relies on the executive summary in extending credit.  According to Anderson, this document shows whether a borrower can afford to make payments.   In preparing it, he considers a borrower's acreage, yields, grain inventory and other loans.  He also includes a cash flow assessment in the executive summary.  Debtor's projected net cash flow was $472,727.

Anderson also prepared a collateral analysis for Debtor's loan dated February 1, 2013.  Again, Anderson said he typically considers this type of report in considering a credit extension.  He explained that this document contains information from the balance sheet and the cash flow summary to assess "how [Horizon] would sit in collateral position."  In his collateral analysis, Anderson lists a total loan to value ratio of 60.5 percent and a collateral margin of $961,567.  Debtor did not sign the collateral analysis.

Like the collateral analysis, Anderson dated Debtor's risk report February 1, 2013.  FINPACK generated Debtor's total score of 75 on the risk report using the following criteria:  liquidity, solvency, collateral analysis, profitability, repayment capacity, financial efficiency and customized criteria including number of years in business, balance of credit cards, general management practices and payment history.  FINPACK's recommendation ("Go For It") is based on the overall rating ("3A") which corresponds to the total score.  In his notes on the on Debtor's risk report, Anderson wrote:

Dean had a good year in 2012.  Increased equity from prior year.  Still has 2012 operating on the books but has enough grain inventories to cover operating with $225k left over and above.

Dean has a solid equity position of $2.04mm.  Has shown good increases every year for the past 3 years.  Downfall is no long term assets (farm)

Cash flow for 2013 looks to cover his obligations.  Does show a margin of $472k which does leave room for any down turn in the markets or poor crop yields.

Dean has made some progress on his finances over the past few years.  He has taken on most of the family farming operation and again cash rented an addl 750 acres since last year, is planning on more costly crops with the addition of corn.

The bank is well secured.  We do have a crop mtg and blanket coverage on equipment.  [T]here appears to be about $961k of excess collateral.

Dean does a good job with his farming operations.  He does a nice job on raising crops and seems to handle his management ok.  Down fall stioll [sic] may be his equipment purchases and updates fairly frequently and no farm land ownership.

P-231.  Debtor did not sign the risk report.

Anderson also prepared a cover sheet titled "Agriculture Loan Evaluation and Comment," dated February 2, 2013.  It includes a line for "Approved Date/BY Whom?" which is blank, and another line titled "Banks Internal Ln Rating" which reads "75 (3A – Go For It)."  D-154.  In the section for "Comments on performance, Changes in Financial Position, Strength, Weaknesses, and Plan of Action," Anderson stated, "A good year in 2012.  Increased equity.  Has a strong equity position of $2.04mm.  Cash flow looks good for 2013.  Bank is well secured."  Id.  Under "Strengths," Anderson wrote, "Strong equity position, bank is well secured, cash flow for 2012 looks solid."  Id.  Under "Weakness," Anderson wrote, "Heavy debt load, no long term farm assets."  Id.  Anderson explained at trial that Debtor did not own any real property to use as

collateral.  Instead, the loan was secured by crops, inventory, equipment, machinery and an assignment of crop insurance proceeds.  Anderson left blank lines or spaces for "Credit Committee Minutes," the signature of the senior loan officer and secretary, the date and a section for "Conditions Required for Managing This Credit."  Id.

Similarly, Anderson did not enter the date of the last inspection on the cover sheet.  Horizon's written loan policies[13] provide that farm inspections are to be performed at least every 36 months for borrowers with Debtor's credit rating.  The policies further provide that farm inspections should be documented with a farm inspection report.  Anderson testified that farm inspections involve visiting the farm with a list of machinery and equipment and looking at the specific items on the list.

According to Anderson, the last inspection of Debtor's farm was "probably quite a while in the past."  He conceded he did not recall ever inspecting Debtor's assets and it was possible he never had.  Anderson explained, however, that he viewed Debtor's equipment from the highway as he drove by Debtor's farm.  He testified that he was confident in Horizon's first lien position and was comfortable with the value of Debtor's property securing Horizon's loan.

---

[13] Horizon's board of directors promulgate its loan policies.  Anderson acknowledged that, as a member of the board of directors—currently and in 2013—he formulates, and is familiar with, the loan policies.  He emphasized, however, that the policies provide general guidance but are not "set in stone."  The policies provide that departures from loan policy require approval by the senior lender or the board of directors.  There is no indication in Debtor's file that Anderson obtained approval to depart from the loan policies.

Horizon's written policies also state that a farm budget will be prepared each year for all farm borrowers with aggregate borrowings of greater than $50,000. Further, "[w]hen a new budget is prepared each year, an effort will be made to check to see if the previous year's budget was met. If the previous year's budget was not met, reasons why should be determined and a comment made in the credit file." P-218. There is no evidence that Horizon followed these policies in Debtor's case.

Debtor executed a Promissory Note in favor of Horizon in the original principal amount of $1,000,000 dated February 1, 2013. The loan was secured by collateral listed in a 2002 security agreement.[14] Horizon charged a five percent interest rate. The promissory note did not include any specific repayment provisions.

Anderson's file for Debtor included a document checklist. Anderson used this checklist, though it was not forwarded to the loan committee or the board of directors. It shows that the 2010 return was the most recent tax return Horizon obtained from Debtor. At the bottom of the document is a list of requirements for loan committee review. It includes "Credit Report—need for all new loans and loan officer discretion on existing loans" and "Lien Search before filing a new UCC-1 after filing a UCC-1 do a manual search and indicate in comments or perform another Lien Search." D-110. Anderson acknowledged that Debtor's 2013 loan was a new loan. The checklist indicates that Anderson last performed a lien search on January 15, 2010, and last requested a credit report on February 8, 2011.

---

[14] On February 25, 2002, Debtor executed a Commercial Security Agreement. In the security agreement, Debtor granted Horizon a security interest in accounts, inventory, equipment, documents, farm products and supplies, government payments and programs, investment property, deposit accounts and specific items of property. Horizon filed a financing statement on November 5, 2002.

When asked whether he would treat a new customer seeking a $1,000,000 loan differently than a returning customer, Anderson stated that he would perform more due diligence for a new customer because he or she would not have any history with Horizon. For the new customer, Horizon would require a recent lien search, a credit report, three years of tax returns and a financing statement.

When Horizon granted the 2013 operating loan to Debtor, Anderson's lending authority was limited to $500,000. Horizons' loan policies required its loan committee to approve a loan if it exceeded the loan officer's lending authority. Further, because the loan exceeded the highest individual lending authority,[15] the policies required Horizon's board of directors to approve the loan as well. Anderson recommended approval of the loan to both the loan committee and the board of directors.

Anderson testified that it is his practice to review all of the documents discussed above before recommending a loan to the loan committee. Anderson testified that he would have had concerns about whether Debtor could make the loan payments if Anderson had known the numbers on the balance sheet were inaccurate. Further, he stated, "It'd be tough to know what you could believe if [Debtor] was falsifying information." Anderson claims that he would not have submitted the loan to the loan committee if he had known Debtor's balance sheet included false information. He testified that he relied on Debtor's balance sheet in seeking approval of Debtor's loan

---

[15] John Vollmer, the president of Horizon Bank, had the highest individual lending authority at $600,000.

because it showed improvement in Debtor's net worth over the years and that Debtor

would be able to repay the $1,000,000 operating loan.[16]

Anderson conceded, however, that he relied on Debtor's "reputation for being

able to manage his farm and being able to repay his loans in the past."  Further, he

agreed that Debtor's credit history was an "important" consideration in recommending

his 2013 operating loan for approval to the loan committee.  Although Anderson claimed

Debtor's "long good history" and Anderson's relationship with Debtor were not the only

factors on which the credit decision was based, Anderson agreed that a "hallmark" of

agricultural lending is the personal relationship between the loan officer and a borrower

that develops over many years.  It is "relationship banking."  There had also been five

great years of high grain prices and farm profits as of February 2013, and Anderson

acknowledged that this too might have played a part in his decision to recommend

Debtor's loan for approval.  Further, most of Anderson's clients "saw improvement"

during that time, and the farm economy was doing well in general.

### 1.    Loan Committee

According to John Vollmer, the president of Horizon,[17] the purpose of the loan

committee is to provide group analysis of a loan "before it goes on to board approval."

The loan committee reviews the work of the loan officer and reaches "a consensus of

whether or not this is a good loan or a bad loan."  The committee members raise issues

---

[16] Debtor's January 17, 2012, balance sheet listed a net worth of $1,913,977.
Anderson characterized Debtor's net worth as equity.  Anderson testified that, typically,
he looks at a borrower's balance sheet from the prior year to see whether the
borrower's equity position increased or decreased.

[17] Vollmer is on the loan committee and is the chairman of the board of directors.

they identify and ask the loan officer presenting the loan questions. This analysis might involve scrutinizing a borrower's balance sheet, collateral risk analysis or any other document.

Anderson has served on the loan committee most of the time he has worked at Horizon.  Anderson could not recall a specific example of the loan committee disapproving one of his loan recommendations, but he said it has happened.  At the time at issue, Anderson, Vollmer, Kevin Davidson, Denise Hornstein, Peggy Balsdon and Bobby Foster comprised the loan committee.  They were all Horizon employees at various Horizon branches.

The loan committee met by telephone, as is customary at Horizon, on February 5, 2013.  Anderson testified that one other committee member, Bobby Foster, attended the meeting with him at Horizon's Munich branch, one member was at the Osnabrock branch, and the rest participated from the Devils Lake branch.  Anderson testified that Foster might have reviewed hard copies of Debtor's documents, although Anderson could not specifically recall.  The other committee members had access to the documents on FINPACK.[18]  Because the meeting was telephonic, Anderson did not know whether the other members actually reviewed Debtor's documents.

The minutes from the February 5, 2013 loan committee meeting list Debtor's loan among six others under "New Loan Request."  D-118.  The minutes state, "Bryan requested a loan for Dean Borstad of $1,000,000 for '13 LOC[.]"  Id.  The minutes include two other references to Debtor.  The first is under "Over Drafts" and states

---

[18] Anderson testified that when he is not the loan officer presenting a loan to the committee, his practice is to review a borrower's documents prior to or during the committee meeting.

"Dean Borstad—LOC."  Id.  The second is under "Past Due Loans" and states "Dean

Borstad—Needs to come in and sign paperwork for LOC[.]"  Id.  Anderson could not

specifically recall a discussion about Debtor's overdraft or past-due loan.  He also could

not recall any details about the defaulted loan but thought it might have been Debtor's

2012 operating loan.  He also thought Debtor's overdraft might have been cured

through an advance on the 2013 operating loan.

Anderson remembered no details about the meeting,[19] but he was certain the

committee approved Debtor's loan.  The minutes, however, include nothing about

whether the loan committee approved or disapproved the loan to Debtor.  Anderson

explained that the practice is to list only the loans that are not approved in the minutes.

According to Anderson, because Debtor's loan is not listed, it was approved.[20]

Robert ("Bobby") Foster testified he was familiar with Debtor and aware of

Debtor's 2013 operating loan but conceded he did not remember anything about

reviewing Debtor's loan during the loan committee meeting.  He opined that the

inaccuracies on Debtor's balance sheet were "material" because they reflected a more

favorable financial condition.  Further, these inaccuracies, if known to the lender, would

prompt the lender to question what else might be inaccurate.  He conceded, however,

that the duration of a relationship with a given borrower is a factor the loan committee

considers in deciding whether to approve a loan.

---

[19] Anderson could not recall details about any part of the committee's discussion
about Debtor's loan or any of the other six loan applications the committee reviewed at
the meeting.

[20] Anderson's testimony regarding Horizon's practice of listing only those loans
the loan committee disapproves in the minutes is contrary to Horizon's loan policies.

Denise Hornstein was the secretary of the loan committee at the time it considered Debtor's 2013 operating loan.  As secretary, Hornstein is responsible for recording the loan committee minutes.  Like Anderson, she maintained that if a loan is approved by the loan committee, it is not included in the minutes.  Horizon's loan policy, however, requires that following each loan committee meeting, "the secretary will be required to prepare minutes of the meeting noting committee action, substantive comments and recommendation."  P-218.  Like Anderson, Vollmer and Foster, Hornstein remembered no specific details of the loan committee meeting or review of Debtor's loan other than remembering the loan committee approved it.

Foster, Hornstein and Vollmer all agreed that it was Anderson's practice to call and receive approval from a quorum of the loan committee, followed by formal approval by the loan committee, as is typical when a borrower needs funds before the loan committee meets to review a loan.[21]  They also all testified that they rely on a borrower's balance sheet, cash flow analysis, collateral analysis and risk rating when reviewing loans as a member of the committee.

Anderson maintained a comment sheet regarding Debtor's account on which he recorded the basic terms of Debtor's loans, other transactions such as Debtor's payments and a comment pertaining to the relevant entry.[22]  Over the years, Anderson

---

[21] Anderson testified that he must have received approval over the telephone, which would not be out of the ordinary, although he could not remember anything about it.

[22] Anderson's comments include notes about Debtor periodically selling equipment that serves as collateral for his loans with Horizon and purchasing replacement equipment—a practice Anderson characterized as "jockeying equipment"—with Horizon's knowledge and apparent permission.  For example, in an entry on the comment sheet from August 1, 2003, Anderson stated, "Dean for the past couple years has been jockeying equipment himself; mainly headers but has started

repeatedly wrote that Debtor "handled" past credit well and was a longstanding good

customer and a good farm operator and manager.  D-117.  Anderson testified that the

dates on the comment sheet correspond to the dates the transactions occurred.

Anderson wrote the following comment in Horizon's records on February 6, 2013:

> **Today Dean stopped in needing to set up his '13 line of credit.**  Dean
> did request a larger amount of credit than he normally does in the past as
> he will be taking over more of his father Terry Borstad's farm operation.  We
> did update financial statements, cash flow, collateral analysis and risk rating
> and upon reviewing I felt everything looked good.  Dean did have a good
> year in '12.  His cash flow in '13 does look to cover all of his obligations with
> adequate margins remaining.  Dean has been a long time borrower of the
> bank and has handled past credit fairly well these past few years.  He does
> show a strong equity position which Dean has had some good years these
> past few years which has boosted his bottom line.  We are adequately
> secured on Dean by having a full blanket lien on his farm.  Overall, Dean
> has shown the ability to handle his debts fairly well, has been paying down
> and improved his debt to equity position.  Dean's downfall is that he does
> not own any farm real estate and does cash rent on all the acres he does
> farm.  Overall, I felt that he should be able to handle this line of credit well
> and this would be a good loan for the bank.  **I did approve this loan
> through loan committee and board.**

Id. (emphasis added).

Debtor's 2011 tax return, dated October 12, 2012, listed $336,492 in farm losses.

Anderson was unable to say when he first saw Debtor's 2011 tax return or whether it

was in the Bank's file in February 2013.  Horizon's normal practice requires a borrower

to provide any tax return to Horizon after the borrower files it.  Anderson explained that

he considers farm expenses such as depreciation when he looks at a tax return to

determine whether a borrower can make payments.  He also considers crop inventory

because "it can help with repayability."

---

doing that with combines."  D-117.  Horizon also condoned Debtor's equipment sales.
Anderson testified that the sale proceeds were typically applied to Debtor's loan but that
sometimes he let Debtor keep them.

Horizon "booked" Debtor's 2013 operating loan on February 6, 2013, meaning this is the date Debtor signed the promissory note and the loan "went into the system," according to Anderson.  As of this date, Debtor could have drawn the entire $1,000,000.

On February 12, 2013, Horizon and Borstad executed a note addendum reducing the interest rate on Borstad's 2013 operating loan from 5 percent to 4.75 percent.  Debtor did not ask for the interest rate reduction and had no idea why Horizon reduced the rate.  Anderson testified he did not know why he offered to reduce the interest rate but that it might have been his idea.  According to Anderson, the decision to reduce the interest rate did not require approval from the loan committee or the board of directors.  Anderson did not add an entry related to the interest rate reduction on the comment sheet.

### 2.   Board of Directors

Although the loan was "booked" on February 6, 2013, Debtor's loan had not been formally approved.  Horizon's loan policies required its board of directors' approval in addition to the loan committee's approval.  The board of directors met on February 15, 2013, but Anderson—who is also on Horizon's board of directors—surmised that Debtor's loan was probably reviewed at the March meeting of the board of directors.  The minutes from the February 15, 2013, meeting of the board directors do not include any reference to the board's review of any new loans.

The March meeting minutes do not mention the Debtor's 2013 loan.  They list other new loans, however:

> The board reviewed the New Loan Report* for the month of February.  Mark made a motion to approve the new loans for the month, Richard seconded.  Motion carried.

> New loan applications brought to the board for review.

- [Redacted name] in looking for 2013 farm operating note in the amount of $600,000 due to legal lending limits.
- [Redacted name] requested for 2013 farm operating in the amount of $900,000.
- [Redacted name] requesting $500,000 for 2013 farm operating.
- [Redacted name] requesting $500,000 for 2013 farm operating[.]
- [Redacted name] requesting $500,000 for 2013 farm operating.
- [Redacted name] requesting $850,000.00 for 2013 farm operating.

D-121.  Horizon stipulated at trial that Debtor's name was not among those redacted from the copy received at trial.

Anderson testified that because Debtor's loan was "booked" on February 6, 2013, but would not be approved by the board of directors until late March, he called the board members to get their approval before the board meeting.  He admitted, though, that he does not remember calling the board members.  Horizon's loan committee and board of directors make their decisions by a quorum.  Six directors comprise the board, so Anderson needed the approval of four directors.  The board members are not all bankers—rather, the board includes a farmer, a contractor, an oil engineer and a lumberyard operator in addition to Anderson and Vollmer.  They are all businessmen who understand financial documents.  Unlike the loan committee members, most of Horizon's board members are not Horizon employees with access to FINPACK documents.  Therefore, they did not have access to any of the loan documents if Anderson called for their approval.  Instead, according to Anderson, they relied on his personal judgment and recommendation, though they also could have spoken to other members of the loan committee.  The board gives deference to the loan committee and the loan officer.  According to Vollmer, the board relies on the loan committee.

Anderson could not recall a loan that was approved by the loan committee but disapproved by the board of directors.  This, apparently, includes Debtor's 2013 loan.

### B.      Events in 2014

Although Debtor did not obtain an operating loan for 2014, he signed a 2014 balance sheet dated March 13, 2014.  The 2014 balance sheet listed a $30,000 account receivable for custom work owed by Terry Borstad, Debtor's father.

On July 10, 2014, Terry Borstad wrote Debtor a check for $65,000.  A note on the check states "machinery rent."  Debtor testified that he asked his father for the money because his father owed him $30,000 at the time, and Debtor had a $55,000 overdraft at Horizon and was in default on equipment payments to John Deere and CNH.  Debtor deposited the check into his Horizon account but did not inform Horizon that the funds included a payment for the $30,000 receivable.

The 2014 balance sheet lists the three antique tractors valued at $6,000 each. The previous balance sheets listed their value at $8,000 each.  Debtor was unsure about the reason for the changed value.  The 2014 balance sheet contained several changed values, but Debtor did not remember any discussion with Anderson about the changes, and Debtor did not notice the changed values when he signed it.  Anderson's practice was to carry the values forward except where Debtor traded in pieces of equipment, and Debtor only remembered discussing with Anderson the pieces of equipment he traded.

### 1.      Divorce and Loan Extensions

On February 21, 2014, Horizon and Debtor executed a note addendum extending the maturity date of Debtor's 2013 operating loan from February 21, 2014, to May 21, 2014.  Anderson explained that Horizon extended the maturity date because

Debtor was going through a divorce and was not able to liquidate grain in time to pay

the note in full.  Horizon allowed Debtor additional time to repay the note.  In his entry

on the comment sheet for February 21, 2014, Anderson stated:

> Today Dean applied an interest payment of $1567.50 on loan #19505452
> and an extension was done on the principal to allow Dean more time to sell
> grain inventories and to work through his divorce, as he stated that he may
> not be able to sell any more grain until more is known with his divorce
> proceedings.

D-117.

According to Debtor, he and Amy Borstad separated in March 2014.  After the

separation, he lived with his parents for two or three months.  Debtor acknowledged that

he did not immediately notify Horizon of the separation but stated that he had a

conversation with Anderson "at some point," telling him not to send the account

statements to the post office box that the statements had been sent to during his

marriage.[23]

On June 30, 2014, Horizon and Debtor executed another note addendum.  This

addendum extended the maturity date of the loan from May 21, 2014, to September 21,

2014, and terminated Debtor's line of credit.  Anderson explained that Horizon granted

the extension because Debtor's divorce took longer than expected.  The extensions

required loan committee and board of directors approval.  Horizon offered no evidence

of loan committee or board of directors approval to grant the extensions.

---

[23] Anderson also recalled Debtor telling him he moved, but Anderson was not
sure when the conversation took place.

The state court entered a divorce judgment in Debtor and Amy Borstad's case on September 2, 2014. Debtor conveyed the rental home to Jeremiah Masterson pursuant to the divorce decree.

### 2.    Auction and Setoff

Debtor sold substantially all of his farm equipment at an auction conducted by Steffes Auctioneers on September 24, 2014. The sale did not generate the proceeds expected.[24] For example, a large tractor valued at $250,000 on Debtor's balance sheets sold for $147,500 when Debtor expected it to bring $200,000. Another large tractor valued at $290,000 on Debtor's 2014 balance sheet sold for $187,500, and Debtor expected it to sell for $290,000. Debtor testified that all of the higher-valued items generated similarly disappointing auction values. Horizon received all of the net auction sale proceeds, $604,050.44. After the sale, Debtor owned no remaining crop inventory or machinery or equipment of any value.

On September 29, 2014, Vollmer sent Debtor a letter stating that Horizon exercised its right to offset Debtor's deposit account due to his default on the loan. On November 14, 2014, Vollmer sent Debtor another letter stating that his checking account had been overdrawn for 35 consecutive days with a current overdraft of

---

[24] Approximately a week before the auction, Anderson wrote notes about the upcoming auction. He listed Borstad's debt as $1,047,000, the auction costs, and anticipated sale proceeds of close to $2,000,000. Anderson testified that the $2,000,000 figure came from Debtor's conversation with the auctioneer. According to Anderson, both Debtor and the auction company were confident that Debtor's equipment would sell for enough to satisfy the debt to Horizon. Anderson testified that he did not expect the auction proceeds to satisfy Debtor's debt because agricultural commodities and equipment values were declining throughout the summer of 2014.

$842.50.  Vollmer further stated that Horizon's policy was to close any checking

accounts overdrawn for 45 consecutive days.  Anderson sent Debtor a letter on

December 10, 2014, informing him that Horizon was closing Debtor's checking account.

### 3.    Header Proceeds

In October or November 2014, Debtor received $8,000 for a header he sold in

2012.  Horizon held a security interest in the header at the time.  Debtor deposited the

$8,000 into an account at Bremer Bank.  Debtor asserted that he deposited the money

into his account at Bremer because he no longer had an account at Horizon.  Debtor

knew at the time that he deposited the money into the Bremer account that the auction

sale proceeds did not satisfy his debt to Horizon.  Debtor spent the $8,000 on

necessary personal expenses, including paying his bankruptcy attorney because he had

no other funds.  Debtor testified he used the $8,000 without any intent to harm Horizon.

### C.    Bankruptcy

In October 2014, Debtor met with attorney Shawn Autrey to discuss the

possibility of petitioning for bankruptcy relief.  Autrey did not specifically remember his

first meeting with Debtor or, for that matter, any meetings with him.  He testified,

however, that typically during his initial meeting with clients, he explains the bankruptcy

process, answers any questions they may have and gives them a questionnaire to

complete.  He tells them to obtain six months of paystubs, a certificate of credit

counseling and tax returns and to return them with the questionnaire.  He tells them to

answer every question on the questionnaire in detail including those that do not apply to

their situation.  For those questions that do not apply, he tells them to write "N/A."

Debtor completed the questionnaire.  Debtor listed his rent or home ownership

expense as $0.00.  He did not list a debt to his father.  Debtor also omitted the transfer

of his interest in the bat-wing mower and anhydrous applicator in satisfaction of the debt to Weisz  Although Debtor did not include this information on the questionnaire, he asserted that he explained the situation with Weisz to Autrey.

Debtor testified that he did not talk to Autrey when he returned the questionnaire. Instead, Autrey contacted Debtor after he received the materials.  Debtor did not remember Autrey asking him any questions, but he recalled meeting with an assistant from Autrey's office who asked Debtor for more information.

Debtor had difficulty contacting Autrey.  According to a November 3, 2015 email from Debtor to attorney Roger Minch, Debtor's counsel in this adversary proceeding, Debtor described the situation:

> I am sending you a few things on how things were done with Shawn Autrey. November 10, 2014 email on page 171, I wrote Shawn telling him I am finishing my paperwork and had some questions.  The process was done back and forth by email and I always had to be the one asking the questions wanting to make sure I was doing it right.
>
> December 9, 2014 email on page 169, I wrote Shawn asking what is the next step?
>
> December 15, 2014 email on page 130, I wrote Shawn asking where we were at again?  Tried to call him over and over and he was never in.

D-161.

Autrey testified that it is his practice to prepare the petition after a client returns the questionnaire and to request a meeting with the client to discuss the petition.  He reviews the petition page by page with the client to ensure its accuracy and asks them to sign the petition next to their name and their electronic signature.  He testified that he tells them, "everything is under oath and that it has to be truthful.  And if, for some

reason it's considered fraud, you could get kicked out of bankruptcy." He also warns them that they can be charged criminally "if it's really, really bad."

Autrey filed a voluntary Chapter 7 petition for bankruptcy relief for Debtor on January 21, 2015. Debtor read the petition before Autrey filed it. The petition did not list a Toro mower that Debtor purchased on May 21, 2014, for $5,250 as an asset. Debtor testified that he gave the mower to his girlfriend, Amy Lee, in lieu of paying rent. The mower is at the house where he currently lives with Amy Lee. At both the meeting of creditors and during his deposition, Debtor testified that he was not paying rent. In his answers to interrogatories signed on July 23, 2015, however, he stated he owed Amy Lee $450 per month for rent. He further claimed that he owed Amy Lee $5,400 when he transferred the mower to her. Like Debtor's questionnaire, the petition listed Debtor's rental or home ownership expense as $0.00.

Debtor also did not list any gifts within one year of his bankruptcy petition on his statement of financial affairs. He did not list any transfers of property within two years of his bankruptcy. He did not list a debt to his father or the setoff of his debt with Weisz. Among his personal property listed on Schedule B, Debtor included a 2010 Joyner 4x4 ATV.

Cheryl Bergian is the Chapter 7 Trustee assigned to Debtor's case. Trustee Bergian presided at two meetings of creditors in Debtor's case. The first meeting of creditors was on February 19, 2015. Trustee Bergian asked Debtor if anyone owed him money, if he had any property that was not listed or if he transferred any property in the last 90 days. He answered "no" to each question. Either the trustee or counsel for a creditor asked Debtor if he owed Weisz money, and Debtor said "no." Debtor clarified

at trial that he answered that way because also owed Weisz an offsetting amount of money.

Trustee Bergian sent a letter dated February 23, 2015, to Autrey confirming information requested at Debtor's meeting of creditors.  In the letter, she requested Debtor provide the information to her by March 12, 2015.  Again, Debtor had trouble contacting Autrey.  He sent emails and left phone messages, but Autrey rarely responded to Debtor promptly.

Debtor clarified the issue of an anhydrous applicator in an email to Autrey dated March 3, 2015:

> One question I have is the Morris Anhydrous applicator listed on the Sched B Personal Property does belong to Darin Weisz for traded custom work / misc he did for me.  If the property can't show Darin receiving full interest then we really need to list him as me owing him $7,190.  I didn't realize that this process would be so knit picky – part of farming with friends and neighbors is the trading back and forth which happens all the time.  I just want things right!

D-162.  Debtor testified that he did not understand that giving Weisz his half interest in the mower and applicator to settle their debt was a transfer he needed to disclose in his bankruptcy—he viewed it as a debt that was owed that he paid.  Debtor testified he was "positive" he told Autrey that he owed Weisz money and Weisz owed him money and about "settling up" the debts.  Debtor described the situation to Autrey as "pretty much a wash."

Debtor gathered all the information Trustee Bergian requested.  He planned to send the information to the Trustee through Autrey, but he called and emailed Autrey "quite a few times" without response.  Debtor sent Autrey another email on March 9, 2015, stating:

> After our creditor meeting there are some things that need to be looked at.
> I am not sure how you want to handle this but here are the things that I see.
> I have tried to reach you but you have been out of the office.  After being
> drilled and drilled I went through EVERYTHING with a fine tooth comb.  I do
> not want anything to prevent this from getting done.  Let me know your
> thoughts as soon as possible please!!!!!!!!!!!!

D-161.  Debtor then addressed many of the issues raised by the Trustee without

Autrey's assistance.  He sent the information directly to the Trustee by overnight mail to

meet the deadline.

Trustee Bergian held another meeting of creditors on March 19, 2015.  Prior to

the second meeting of creditors, Autrey was "sure there was probably some

conversation" with Debtor because Debtor needed to supply further information

between the first and the second meetings.  However, Autrey did not recall meeting with

Debtor.

Autrey filed amended schedules and an amended statement of financial affairs in

Debtor's case on March 31, 2015.[25]  The amended statement of financial affairs added

four transfers: 1) the property to Amy Borstad in the divorce on September 2, 2014;

2) the auction proceeds from the farm equipment to pay secured creditors on October 2,

2014; 3) the transfer of the house to Jeremiah Masterson in 2014; and 4) the bat-wing

mower to Weisz in September 2014.

---

[25] Autrey did not recall any specific conversations with Trustee Bergian about
Debtor's case, but if Autrey knows that an amendment is necessary before the meeting
of creditors, he lets Trustee Bergain know about it.  If any amendment needs to be done
in a case, he does it after the meeting of creditors so that if there are multiple
amendments necessary, he can make them all at once.  That is why, in this case,
Autrey waited until after the second meeting of creditors to file Debtor's amendments.

Amended Schedule B included the Toro mower valued at $4,500 that he gave

Amy Lee although he testified he was not sure why Autrey added this.  Debtor asserted

he never told Autrey he owned the Toro mower.  Debtor explained in an email to Minch:

> March 9, 2015 email on page 178, I wrote Shawn with the changes that
> should be amendments and the ones that I knew of that needed to be done.
> There isn't anything in this list that refers to the Toro mower.  I know it was
> talked about at either the meeting of creditors or the 2004 examination and
> Shawn added it to the amendments, putting it where he thought it should
> go.  Which he put it under my personal property and the bank is having
> heart burn about this, it should have been under transfer of property.

D-161.

Debtor's amended statement of financial affairs did not include the gift of his

tractors to his children.  It also did not include the setoff of debts between Debtor and

Weisz or the transfer of his interest in the mower and applicator to Weisz.  Rather, his

amended Schedule F lists Weisz as an unsecured creditor with an unknown claim.

Debtor's father is also listed on Schedule F with an unknown claim.

Although the amended schedules and statement of affairs show Debtor's

electronic signature, he claims Autrey sent him the amendment cover sheet but not the

amended schedules or statement of financial affairs.  Debtor testified that he did not see

any of the amendments or have a discussion with Autrey about using his electronic

signature before Autrey filed them.  He maintained that the first time he saw the

amendments was either at the meeting of creditors or his deposition.

Trustee Bergian attended Debtor's deposition on September 22, 2015.  Trustee

Bergian noted her appearance in this adversary proceeding and appeared at the

hearing on Debtor's Motion for Summary Judgment heard on October 27, 2015.

Trustee Bergian views this as a two-party dispute between Debtor and Horizon that does not affect her ability to administer the estate.  She participated in the adversary proceeding because both parties raised issues involving potential assets of the estate.  Debtor told Trustee Bergian about claims the estate might have against Horizon and Amy Borstad.  Trustee Bergain told Debtor that, because he disclosed information to her about these possible claims, further amendments related to them were unnecessary.

Trustee Bergian testified that as of the trial, Debtor had given her all the information she requested.  She maintained that there were no nondisclosures or other problems with the Debtor's filings or testimony at the meetings of creditors that hindered the proper administration of Debtor's estate.

### D.    Expert Testimony

George Bassingthwaite testified at trial.  He began working in the banking industry in 1960 and retired in 1999.  His roles in the banking industry over the years included loan officer, loan committee member, credit manager, branch manager and general manager.  His responsibilities included training, preparing financial documents, credit oversight and administration, business development, servicing loans, financial analysis, supervising staff, establishing credit procedures for approval of agricultural loans and writing bank policies and procedures.  He is now a consultant.

Bassingthwaite reviewed Debtor's loan file and Horizon's loan policies.  He also attended the depositions of Anderson, Foster, Hornstein and Vollmer as well as the trial. Based on his review of more than 1,000 documents associated with the case and the deposition and trial testimony of Anderson, Foster, Hornstein and Vollmer, Bassingthwaite formed an opinion on whether Horizon reasonably relied on the risk

assessment, balance sheet, collateral analysis and executive summary concerning Debtor's 2013 operating loan.  His opined that Horizon did not materially rely on these documents for three reasons.

First, Bassingthwaite searched all of the documents in this case for written communication showing approval of Debtor's loan and found none.  He found no evidence that the loan committee or the board of directors read or reviewed Debtor's financial documents.  Bassingthwaite questioned Horizon's documentation methods such as failing to include notes about a loan approval request in the loan committee minutes unless the loan committee denied it.[26]  He also questioned the lack of formal documentation from the loan committee informing the originating loan officer that it approved the loan.  As for the board of directors, Bassingthwaite found no evidence of its approval of the loan.  Bassingthwaite opined that Horizon's approval process, in its entirety—through Anderson, the loan committee and the board of directors—failed to comply with underwriting standards in the agricultural loan industry.

The short time frame between loan committee access to loan documents and the meeting during which it considered Debtor's loan also lead Bassingthwaite to conclude that Horizon did not rely on the loan documents.  Debtor met with Anderson to gather the financial information on a Saturday morning.  The loan committee meeting during which it reportedly approved Debtor's loan was the following Tuesday.  According to Bassingthwaite, one day to review the loan documents—Monday—is not enough time

---

[26] The Court also received Elaine Brinkman's expert witness disclosure and deposition transcript.  She testified consistently with Bassingthwaite's opinions except for one conclusion.  She opined, "It is common in other banks that if the loan is not specifically denied in the minutes, the loan was approved for funding."  D-143.

for a complete analysis of the documents.  Further, the loan committee meeting minutes listed six new loan requests in addition to Debtor's request that the committee considered during its one-hour meeting on February 5, 2015.  Bassingthwaite opined that one hour is insufficient time to review that many loans—there were several large loans listed and Debtor's loan alone should have taken "15, 20 minutes, half an hour if not more."

The third reason Bassingthwaite listed in support of his opinion that Horizon did not reasonably rely on Debtor's financial information is that none of the loan committee members remembered reviewing Debtor's loan documents.  Bassingthwaite found it very unusual that no one remembered anything about a $1,000,000 loan that "went south" a year later, leaving Horizon in a "loss position."  He suggested that a natural reaction for those who approved the loan would be to question what they might have missed to put Horizon in a position to have a large loan "go bad" in a year.  In Bassingthwaite's experience, lenders tend to remember a bad loan considerably longer than the good loans that do not end up with problems.

Bassingthwaite maintained that no one at Horizon except Anderson reviewed or relied on Debtor's financial information at all.  Rather, Bassingthwaite maintained that Debtor's 20-year relationship with Horizon overshadowed the balance sheet and other documents in its decision-making process.

Bassingthwaite also testified that Horizon's reliance on the financial information Anderson compiled was not reasonable for a number of reasons.  First, Debtor's financial statements lacked background information such as Debtor's historical profits and losses.  Horizon's loan policy required either a tax record or operating statement to

corroborate the balance sheet to document a profit or loss from the previous year.

Debtor's file contained no evidence of an analysis of whether Debtor had ever met the

projections.  Also, his cash flow projections did not include any trends or a budget.  In

addition, Bassingthwaite found no evidence of Debtor's marketing plans or repayment

schedule, and he observed that Debtor had no working capital.

Similarly, Bassingthwaite opined that Horizon's reliance on Debtor's financial

documents was unreasonable because of the lack of supporting documentation.  Based

on his experience and understanding of agricultural lending practices, Bassingthwaite

expected to see a list of credit factors and Anderson's analysis of how the credit factors

affected the risk rating.  He also opined that Horizon should have, but did not, compile

and analyze Debtor's crop plan, his actual income and expenses, his recent tax returns,

a recent credit check (which Horizon had not performed since 2011), a recent UCC lien

search (which Horizon had not obtained since 2010), copies of Debtor's farmland leases

and machinery contracts.  Bassingthwaite also maintained that Debtor's overdraft and

past-due loans should have prompted questions from the loan committee and board of

directors when they considered his 2013 operating loan, but there was no evidence of

any questions by anyone on the loan committee.

Bassingthwaite also explained that Horizon's reliance on Debtor's financial

documents was unreasonable because Anderson never inspected Debtor's farm

despite the requirement to do so in Horizon's loan policies.  Although Anderson drove

by Debtor's farm, Bassingthwaite claimed that driving by the farm is not an inspection

that would comply with industry standards.  Bassingthwaite suggested a loan officer

should inspect collateral piece-by-piece and verify crop inventory at least once a year for a loan of the type, size and quality of Debtor's loan.

In addition, Bassingthwaite claimed that Horizon should not have extended the maturity date on Debtor's 2013 loan.  The loan, which totaled approximately $900,000 at the time, was past due, yet Horizon did not verify Debtor's crop inventory, inspect other collateral or request updated financial information.  Bassingthwaite found no evidence that Anderson sought or received loan committee or board of directors approval for the extension.

According to Bassingthwaite, Horizon had three options: 1) it could have demanded payment because the loan was mature; 2) it could have offered Debtor a short-term renewal after terminating the open-end feature of the note and calling for repayment from whatever grain inventory remained (which they should have collected at that time); or 3) Horizon could do what it did—extend the line of credit and allow additional disbursements of $165,000 before they obtained another balance sheet to establish their collateral position.  Even after they received updated information, Horizon allowed Debtor to draw another $20,000 from the account.

## II.   CONCLUSIONS OF LAW

Horizon argues the Court should deny Debtor his bankruptcy discharge under section 727 or, alternatively, the Court should deny Debtor a discharge of his debt to Horizon under section 523.

### A.   11 U.S.C. § 727(a)

Horizon seeks a denial of discharge under 11 U.S.C. § 727(a)(2), (a)(3) and (a)(4).  Section 727(a) of the Bankruptcy Code provides that the court shall grant a debtor a discharge unless:

34

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under [the Bankruptcy Code], has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account[.]

11 U.S.C. § 727(a).

Denying a debtor a discharge is a harsh remedy. Home Serv. Oil Co v. Cecil (In re Cecil), 542 B.R. 447, 451 (B.A.P. 8th Cir. 2016) (citation omitted). Therefore, Courts construe section 727 strictly in favor of the debtor. Id. Notwithstanding, a discharge in bankruptcy and the associated fresh start are privileges, not rights. Bauer v. Iannacone (In re Bauer), 298 B.R. 353, 357 (B.A.P. 8th Cir. 2003) (citing Grogan v. Garner, 498 U.S. 279, 286 (1991)). "The opportunity for a completely unencumbered new beginning is limited to the honest but unfortunate debtor." Id. The cost to the debtor for an unencumbered fresh start is minimal, but it includes honestly and accurately disclosing his or her financial affairs and cooperating with the trustee. Id.; see also 11 U.S.C. § 521 (listing a debtor's duties in bankruptcy). "To prevail in an action to deny a debtor's discharge, the objecting party must prove each element under § 727 by a preponderance of the evidence." Kaler v. Charles (In re Charles), 474 B.R. 680, 683–

84 (B.A.P. 8th Cir. 2012) (citing Allred v. Vilhauer (In re Vilhauer), 458 B.R. 511, 514 (B.A.P. 8th Cir. 2011); Fed. R. Bankr. P. 4005).  To meet this standard, the Court must believe the existence of a fact is more probable than its nonexistence.  Northland Nat'l Bank v. Lindsey (In re Lindsey), 443 B.R. 808, 812 (B.A.P. 8th Cir. 2011).

### 1.    Fraudulent Transfer

Horizon asserts Debtor transferred property to Darin Weisz and Amy Lee within one year of his bankruptcy petition with intent to hinder, delay or defraud Horizon or the bankruptcy estate.  Although not pled in its Complaint, Horizon also suggests in its post-trial briefs that Debtor's crop inventory figures are inaccurate or that he converted Horizon's collateral.

To prevail under section 727(a)(2)(A), Horizon must prove, by a preponderance of the evidence: (1) the act serving as the basis for the claim took place within one year before the petition date; (2) the act was that of Debtor; (3) the act amounted to a transfer, removal, destruction, mutilation or concealment of property of the bankruptcy estate; and (4) the act was done with an intent to hinder, delay, or defraud a creditor or the trustee.  See City Nat'l Bank of Ft. Smith v. Bateman, 646 F.2d 1220, 1222 (8th Cir. 1981); Georgen-Running v. Grimlie (In re Grimlie), 439 B.R. 710, 716 n.11 (B.A.P. 8th Cir. 2010); Kaler v. Huynh (In re Huynh), 392 B.R. 802, 810 (Bankr. D.N.D. 2008). Courts presume fraudulent intent in section 727(a)(2) cases where the debtor has gratuitously conveyed valuable property.  The Abbott Bank-Hemingford v. Armstrong (In re Armstrong), 931 F.2d 1233, 1239 (8th Cir. 1991) (quoting Bateman, 646 F.2d at 1222).  "'Once a gratuitous transfer is shown, the burden then shifts to the debtor to prove his intent was not to hinder, delay, or defraud his creditors.'"  Cadlerock Joint

Venture II, L.P. v. Sandiford (In re Sandiford), 394 B.R. 487, 490 (B.A.P. 8th Cir. 2008)

(quoting In re Armstrong, 931 F.2d at 1239).

Horizon established the first three elements for two of the three acts it alleges

support its section 727(a)(2) claim: Debtor transferred property of the bankruptcy estate

to Weisz and Amy Lee within one year before his bankruptcy.  It did not establish that

Debtor transferred crops to a third party or converted crop proceeds.  To the contrary,

the RCIS crop production forms, crop sales data and other evidence received at trial

show that Horizon received the proceeds of all the crops Debtor produced in 2011, 2012

and 2013.  Debtor testified that Horizon received all the proceeds from the sale of his

crops, regardless of where they were sold and whether Horizon was included as a

payee on crop proceeds checks.  Horizon offered no evidence Debtor transferred crops

to a third party or kept the proceeds from any sale.  Innuendo based on Debtor's

allegedly inaccurate crop inventory figures on his balance sheets is not sufficient to

meet Horizon's burden of proving that Debtor transferred, removed or concealed crops

or crop proceeds.

The dispute regarding transfers to Weisz and Amy Lee centers on the fourth

element, which requires proof that Debtor transferred the property with an intent to

hinder, delay or defraud Horizon.  Courts look to the totality of the circumstances

surrounding a transfer and subjectively evaluate the debtor's motive.  Phillips 66 Co. v.

Miltenberger (In re Miltenberger), 531 B.R. 228, 235 (Bankr. W.D. Mo. 2015).  To show

the requisite intent under the fourth element of section 727(a)(2), Horizon must point to

Debtor's admissions of fraudulent intent or demonstrate an inference of actual intent to

hinder, delay or defraud creditors by showing "badges of fraud."  In re Huynh, 392 B.R. at 810.  The badges of fraud include:

> (1) lack or inadequacy of consideration; (2) family, friendship or other close relationship between the transferor and transferee; (3) retention of possession, benefit or use of the property in question; (4) financial condition of the transferor prior to and after the transaction; (5) conveyance of all of the debtor's property; (6) secrecy of the conveyance; (7) existence of trust or trust relationship; (8) existence or cumulative effect of pattern or series of transactions or course of conduct after the pendency or threat of suit; (9) instrument affecting the transfer suspiciously states it is bona fide; (10) debtor makes voluntary gift to family member; and (11) general chronology of events and transactions under inquiry.

Id. (citing MWI Veterinary Supply Co. v. Rodgers (In re Rodgers), 315 B.R. 522, 531 (Bankr. D.N.D. 2004)).

The badges represent generally-recognized indicia of fraud.  The court is not constrained by any list of badges and may consider "'any other factors bearing upon the issue of fraudulent intent.'"  Ritchie Capital Mgmt., LLC v. Stoebner, 779 F.3d 857, 863 (8th Cir. 2015) (quoting Jensen v. Dietz (In re Sholdan), 217 F.3d 1006, 1009 (8th Cir. 2000)).  In other words, courts look to whether the aggregate of facts demonstrates an inference of fraud rather than requiring the plaintiff to show a majority or any specific number of the badges.  Soza v. Hill (In re Soza), 542 F.3d 1060, 1067 (5th Cir. 2008). The presence of a single badge creates suspicion; the confluence of several can create a presumption of fraudulent intent.  Kelly v. Armstrong, 141 F.3d 799, 802 (8th Cir. 1998) (citations omitted); Cf. Brown v. Third Nat'l Bank (In re Sherman), 67 F.3d 1348, 1354–55 (8th Cir. 1995) (the presence of several badges of fraud "can constitute conclusive evidence" of the proscribed intent) (citation and internal quotes omitted).

Horizon offered no direct evidence that Debtor transferred equipment to Weisz with intent to hinder, delay or defraud Horizon.  Likewise, the circumstances

surrounding these transfers do not create an inference of fraud. Debtor offered

evidence substantiating the debts between Debtor and Weisz. Prompted by Debtor's

divorce and his desire to "look out for himself," Weisz sought to "clear up" their

transactions. The parties resolved their claims and debts when Debtor transferred his

half-interest in the bat-wing mower and applicator to Weisz. It is reasonable to infer that

pressure from Weisz served as Debtor's motivation for the equipment transfer--not an

intent to defraud Horizon. "An intent to prefer one creditor over others is not necessarily

the same as an intent to hinder, delay or defraud creditors." Kane v. Chu (In re Chu),

511 B.R. 681, 685 (Bankr. D. Haw. 2014) (citations omitted); see Luwisch v. Rabinowitz

(In re Rabinowitz), 2012 WL 1072212, at *8 (Bankr. D.N.J. Mar. 12, 2012) ("[A]n intent

to prefer one creditor over another is not sufficient to establish intent for section

727(a)(2)(A) purposes"); Ivory v. Barbe (In re Barbe), 466 B.R. 737, 743 (Bankr. W.D.

Penn. 2012) ("[A]n 'intent to prefer creditors is not equivalent to the intent to hinder,

delay or defraud creditors' that is required under § 727(a)(2)") (quoting 6 Collier on

Bankruptcy, ¶ 727.02[3][c]); Freelife Int'l, LLC v. Butler (In re Butler), 377 B.R. 895, 917

(Bankr. D. Utah 2006) (citation omitted)). Thus, Horizon failed to meet its burden of

showing that Debtor transferred his interest in the mower and applicator to Weisz with

intent to defraud Horizon.

Debtor's transfer of the Toro mower to Amy Lee is a closer call. While Horizon

offered no direct evidence of fraud, Debtor's close relationship with Amy Lee creates a

suspicion of fraud.[27] Debtor testified that he owed Amy Lee for rent and gave her the

---

[27] Although the issue was not directly raised at trial, the Court may reasonably infer that Debtor also retains use of the mower because Amy Lee and Debtor live

mower in lieu of rent payments, which shows an exchange of consideration.  As noted above, payment to Amy Lee instead of Horizon, without more, does not show intent to defraud Horizon.  In considering all the facts in the aggregate, Debtor's motive in transferring a $5,250 mower to Amy Lee in lieu of rent does not show, by a preponderance of the evidence, Debtor's intent to hinder, delay or defraud Horizon. Horizon did not meet it burden of proving its claim under section 727(a)(2).

## 2.      Failure to Keep Adequate Records

Horizon asserts Debtor failed to produce documents showing a true and accurate picture of his financial health.  A court may deny the debtor a discharge for the debtor's failure to keep or preserve records from which creditors may ascertain his financial condition, unless the debtor can justify such failure under all the circumstances of the case.  11 U.S.C. § 727(a)(3).  The Bankruptcy Code requires debtors to keep adequate financial records to enable parties and the court to trace the debtor's financial history, reconstruct financial transactions and test the completeness of the disclosure requirements.  In re Huynh 392 B.R. at 809.  Intent is not an element of this cause of action.  Id.  Rather, section 727(a)(3) requires the debtor to take such steps as ordinary fair dealing and common caution dictate to enable the creditors to learn what he did with the property of his estate.  Davis v. Wolfe (In re Wolfe), 232 B.R. 741 (B.A.P. 8th Cir.1999).  The court should not deny discharge if "the debtor's records, though poorly organized, are reasonably sufficient to ascertain the debtor's financial condition.  Id. Although the Bankruptcy Code does not require impeccable bookkeeping, the records

---

together, and the mower is at their residence.  Debtor's retained use of the mower also creates a suspicion of fraud.

must sufficiently identify the transactions so that intelligent inquiry can be made of them. Grisham Farm Prods., Inc. v. Keller (In re Keller), 322 B.R. 127, 132 (Bankr. E.D. Ark. 2005).

The complaining party must make an initial showing that the debtor failed to maintain and preserve adequate records and that this failure makes it impossible to ascertain the debtor's financial condition and material business transactions.  Id.  If the debtor breaches his duty to his creditors to keep adequate records, he must provide some justification for the breach.  Id.  To determine whether the debtor's failure was justified, "[courts] must determine what records someone in similar circumstances would keep."  In re Huynh, 392 B.R. at 812 (citing Floret, L.L.C. v. Sendecky (In re Sendecky), 283 B.R. 760, 764 (B.A.P. 8th Cir. 2002)).  Some factors courts normally consider include "the debtor's education, sophistication, and business experience, size and complexity of the debtor's business, the debtor's personal financial structure, and any special circumstances that may exist."  Id. (citation omitted).  If the debtor cannot justify his failure to keep adequate records, the court will deny the debtor's discharge.  Id.  The court determines whether records are "adequate" on a case-by-case basis, applying a standard of reasonableness.  Id. (citation omitted).

As factual support for its 727(a)(3) claim, Horizon first alleges Debtor was unable to produce any written employment contract or other written agreement requiring him to transfer the house to Jeremiah Masterson.  The Court is not persuaded.  The arrangement between Debtor and Masterson was unquestionably informal, but it was also straightforward.  The Court finds Debtor's explanation for this transaction credible. His lack of records documenting the transaction is not unreasonable under the

41

circumstances and does not make it impossible to ascertain his financial condition or to understand his transaction with Masterson.  Debtor's inability to produce any written employment contract or other written agreement requiring him to transfer the house to Masterson does not show that he failed to maintain and preserve adequate records.

Horizon also asserts Debtor failed to keep adequate records over the course of his relationships with Weisz and Miller, accurately showing the amounts owing between them.  The Court rejects this argument on similar grounds.  Debtor and Weisz had a longstanding, informal and cooperative relationship.  They are both farmers and traded services and products with one another over many years.  Debtor provided a hand-written accounting of their transactions.  Although the accounting was rudimentary, it was not unreasonable.  Debtor adequately substantiated, documented and explained the debts between them.  The Court is similarly unconvinced that Debtor's lack of records regarding the debts between Debtor and Miller for services and equipment they exchanged over the years made it impossible to ascertain Debtor's financial condition and material business transactions.

Finally, Horizon claims Debtor failed to keep or preserve records regarding the sale of his crops for several years before his bankruptcy.  Specifically, it alleges Debtor failed to account for tens of thousands of bushels and hundreds of thousands of pounds of various crops.

At trial, Horizon highlighted alleged discrepancies between the crops Debtor sold compared to Debtor's crop inventory estimates on his balance sheets and crop production reported to RCIS.  Specifically, Horizon argues that Debtor's crop sales in 2012 and 2013 were significantly less than the crop production estimates he reported to

RCIS in 2012 and 2013, when added to the 2011 crop inventory included on Debtor's

2012 balance sheet.  Horizon claims that this evidence shows some of its collateral is

missing.  In support of this claim, Horizon offered Debtor's 2012 balance sheet, RCIS

production reports for 2012 and 2013 and delivery sheets and payment summaries from

grain elevators, which the Court received as evidence.

Debtor responded to this information by highlighting his 2011 crop sales,

suggesting that the data Horizon emphasized included 2011 crop production (or at least

the part of 2011 yield included in inventory) but did not consider 2011 crop sales.

According to the figures Debtor highlighted, Debtor's sales of barley, soybeans and

canola actually exceed 2012 inventory and crop production estimates reported to RCIS

in 2012 and 2013.  Debtor acknowledges a 2,165.4 bushel wheat shortage for this

period.

In reply, Horizon points to Debtor's inventory estimates on his 2011 balance

sheet and maintains the evidence shows a shortage in proceeds compared to inventory

Debtor reported on financial statements and crop production reported to RCIS.

Setting aside crop inventory reports on the 2011 and 2012 balance sheets, it is

apparent that crop production Debtor reported to RCIS in 2011, 2012 and 2013 is very

close to the 2011, 2012 and 2013 yield Debtor sold.  As noted above, Horizon's

suggestion that Debtor converted crops or crop proceeds is rejected.  The crop

inventory estimates included on the 2011 and 2012 balance sheets are not accurate,

however.  It appears that the inventory estimates on these financial statements are high;

Debtor stored fewer bushels and pounds than listed as crop inventory.  Debtor's crop

estimates on the February 2, 2013 balance sheet are also high.[28]  But, the question for purposes of a section 727(a)(3) analysis is not whether Debtor exaggerated his crop inventory on financial statements delivered to Horizon, but whether he maintained and preserved adequate records sufficient to ascertain his financial condition and material business transactions.

Debtor produced RCIS production reports, delivery sheets and payment summaries and other records pertaining to crop production and sales.  This information is sufficient to make an intelligent inquiry into Debtor's crop production and sales and to learn about the transactions related to them.  Horizon failed to meet its burden of proving its section 727(a)(3) cause of action.

### 3.    False Oath

Section 727(a)(4)(A) bars the entry of discharge if a debtor knowingly and fraudulently made a false oath or account in or in connection with a case.  11 U.S.C. § 727(a)(4)(A).  To meet its burden under this subsection, Horizon must prove, by a preponderance of the evidence:  (1) Debtor made a statement under oath; (2) the statement was false; (3) Debtor knew the statement was false; (4) Debtor made the statement with fraudulent intent; and (5) the statement related materially to Debtor's bankruptcy case.  In re Cecil, 542 B.R. at 451 (citation omitted).

The Bankruptcy Code, through section 727(a)(4)(A), "requires nothing less than a full and complete disclosure of any and all apparent interests of any kind."  Korte v. U.S.

---

[28]  For example, Debtor sold the last of his canola (699,360 pounds) and deposited the proceeds in his account with Horizon on January 23, 2013, ten days before he signed the 2013 balance sheet.  On his balance sheet dated February 2, 2013, he reports 650,000 pounds of canola in inventory.

Internal Revenue Serv. (In re Korte), 262 B.R. 464, 474 (B.A.P. 8th Cir. 2001) (citations omitted); Armstrong v. Lunday (In re Lunday), 100 B.R. 502, 508 (Bankr. D.N.D. 1989) ("A debtor has an uncompromising duty to disclose whatever ownership interest he holds in property.").  "The debtor's duty of disclosure requires updating schedules as soon as reasonably practical after he or she becomes aware of any inaccuracies or omissions."  In re Bauer, 298 B.R. at 357.

The proper functioning of the bankruptcy process depends upon the debtor providing complete, accurate and reliable information in the petition and other documents submitted with the petition so that parties in interest may evaluate a debtor's assets and liabilities and appropriately administer the case.  Jordan v. Bren (In re Bren), 303 B.R. 610, 613–16 (B.A.P. 8th Cir. 2004), overruled on other grounds by 122 F. App'x 285 (8th Cir. 2005).  Section 727(a)(4)(A) promotes veracity in the statements and schedules to help prevent creditors and the trustee from resorting to independent fact-finding and investigation.  Daniel v. Boyd (In re Boyd), 347 B.R. 349, 355 (Bankr. W.D. Ark. 2006).  The disclosure requirement has implications beyond the administration of each individual bankruptcy case because "failure to comply with the requirements of disclosure and veracity necessarily affects the creditors, the application of the Bankruptcy Code, and the public's respect for the bankruptcy system as well as the judicial system as a whole."  See Nat'l Am. Ins. Co. v. Guajardo (In re Guajardo), 215 B.R. 739, 742 (Bankr. W.D. Ark. 1997).

"Grounds for the denial of a discharge do not exist where a debtor completes his bankruptcy papers to the best of his abilities and attempts to be complete and accurate."  Walton v. Wheaton (In re Wheaton), 474 B.R. 287, 291 (Bankr. M.D. Fla.

2012).  While courts are often understanding of a single omission or error resulting from an innocent mistake, multiple inaccuracies or falsehoods may rise to the level of reckless indifference to the truth which is the functional equivalent of intent to deceive. Kaler v. Geller (In re Geller), 314 B.R. 800, 807 (Bankr. D.N.D. 2004) (citing In re Bren, 314 B.R.); Golden Star Tire, Inc. v. Smith (In re Smith), 161 B.R. 989, 992 (Bankr. E.D. Ark. 1993).  "[T]he existence of multiple falsehoods, taken together with a failure on the part of the debtor to correct all known inconsistencies, omissions, and misstatements upon first amendment, constitutes reckless indifference to the truth and, thus, the requisite intent to deceive." Kaler v. McLaren (In re McLaren), 236 B.R. 882, 895 (Bankr. D.N.D. 1999) (citations omitted).  The same rationale extends to initial filings in which a debtor makes statements that exceed honest mistakes and are inconsistent and incompatible with the debtor's own knowledge and information.  Id. at 894–95 (noting that the "price" for the relief of the bankruptcy code is "the debtor's utmost honesty and candor in all dealings with the Court.").

Horizon identifies several of Debtor's statements that it claims satisfy section 727(A)(4):

- Debtor denied that Weisz owed him money or that he owed Weisz money at the meeting of creditors and omitted the claimed setoff of the debts on his statement of financial affairs;

- Debtor did not list rent on his schedules, but testified that he owed Amy Lee $450 per month in rent;

- Debtor failed to list the Toro mower he gave to Amy Lee as either a gift or transfer in his original statement of financial affairs.  On his amended schedules, he listed the Toro mower as his property;

- Debtor failed to list his father as a creditor.  After the omission was brought to his attention, he amended his schedules; and

- Debtor's failed to list the transfer of the house to Masterson.[29]

By signing his bankruptcy petition, amended schedules and statement of affairs, Debtor declared under penalty of perjury that the information provided in these documents was true and correct.  This declaration constitutes an oath and satisfies the first element of proof under section 727(a)(4)(A).  In re Bren, 303 B.R. at 613; Cepelak v. Sears (In re Sears), 246 B.R. 341, 347 (B.A.P. 8th Cir. 2000).  Debtor also testified at the meeting of creditors under oath.  Accordingly, the Court finds that Debtor's representations in, and omissions from, his initial and amended schedules and statement of financial affairs, as well as his testimony during the meeting of creditors, are "statements under oath" within the meaning of section 727(a)(4)(A).

The Court also finds that the statements listed above were false.  The Court is not convinced, however, that Horizon proved, by a preponderance of the evidence, that Debtor knew that the statements were false and that he made them with fraudulent intent or reckless disregard for the truth.

As for Debtor's transactions with Weisz, Debtor testified credibly that he did not understand that giving Weisz his half interest in the bat-wing mower and anhydrous applicator to settle their debt was a transfer he needed to disclose in his bankruptcy. He viewed it as an owing debt that he paid.  Further, Debtor told Autrey about these transfers and expected that Autrey would appropriately disclose the arrangement if and where necessary.  Regarding his statements at the meeting of creditors, Debtor clarified at trial that Weisz owed him money and he owed Weisz money.  When Debtor

---

[29] Horizon does not allege that Debtor's failure to list the transfers of the antique tractors to his children is a basis for denial of discharge under section 727(a)(4).

transferred his interest in the mower and applicator to Weisz, their claims and debts almost exactly offset each other.  Debtor's email informing Autrey that Debtor wanted to get everything right supports his claim and testimony that Debtor completed his bankruptcy papers to the best of his ability and attempted to be complete and accurate.

Next, Debtor omitted rent payments on his schedules and stated during his deposition and at the meeting of creditors that he paid Amy Lee no rent.  Technically, his testimony was accurate; Debtor did not pay Amy Lee rent.  He did not provide a comprehensive explanation of the situation, however.  In his answers to interrogatories, he explained that he owed Amy Lee $450 per month for rent and claimed he owed her $5,400 in past-due rent when he transferred the Toro mower to her.  There is no further evidence about this agreement, but this answer explains the apparent discrepancy. While Debtor could have—and should have—explained that he transferred the mower to Amy Lee in lieu of rent payment in his statement of financial affairs and during the meeting of creditors, his failure to do so is not sufficient to establish fraudulent intent.

Horizon also claims Debtor made a false oath by failing to list the Toro mower he gave to Amy Lee in his original statement of affairs as either a gift or a transfer.  Debtor explained that he did not list the mower because he did not consider it his property. Debtor's amended schedules listed the Toro mower as his property even though he claimed he gave it to Amy Lee.  Autrey prepared the amendments, and Debtor testified he was not sure why Autrey added the Toro mower to his list of personal property because Debtor did not think the mower was his and he did not tell Autrey he owned it. Debtor testified about the Toro mower at either a meeting of creditors or Debtor's deposition, and Autrey added it to the schedules on Schedule B rather than listing it as

either a gift or a transfer of property on the statement of affairs.  Debtor had significant, repeated and documented communication problems as a result of Autrey's unresponsiveness, and this treatment of the Toro mower is indicative of those problems rather than Debtor's fraudulent intent.

Lastly, Horizon identifies two omissions from the schedules and statement of financial affairs that were subsequently disclosed in the amendments: listing Debtor's father as a creditor and listing the transfer of the house to Masterson.  When these omissions came to light, Debtor responded appropriately by amending his filings.[30]  See Ellsworth v. Bauder (In re Bauder), 333 B.R. 828, 832 (B.A.P. 8th Cir. 2005) (finding prompt disclosure of an omitted asset on amended schedules evidence of innocent intent).  The Court concludes Horizon failed to prove the initial omissions were motivated by intent to defraud his creditors.   Further, the Court notes that Trustee Bergian testified that Debtor gave her all the information she requested and there were no nondisclosures or other problems with the Debtor's filings or testimony at the meetings of creditors that hindered the proper administration of Debtor's estate.

 Because Horizon failed to establish, by a preponderance of the evidence, that Debtor knew the statements and omissions were false and that he made them with fraudulent intent, Horizon's claim under section 727(a)(4) fails.

**B.     11 U.S.C. § 523**

Horizon seeks a determination of nondischargeability for its debt under 11 U.S.C. § 523(a)(2)(B) and (a)(6).  Section 523 provides that a debt is nondischargable:

---

[30] Debtor did not immediately amend his schedules because it is Autrey's practice to postpone amendments until after the meetings of creditors to avoid multiple amendments.

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

* * *

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; or

* * *

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a). Horizon must prove each element of a section 523 nondischargeability claim by a preponderance of the evidence. In re Lindsey, 443 B.R. at 812 (citing Grogan, 498 U.S. at 286–91). Exceptions to discharge are narrowly construed to effectuate the "fresh start" of the Bankruptcy Code. Cmty. Fin. Grp., Inc. v. Fields (In re Fields), 510 B.R. 227, 233 (B.A.P. 8th Cir. 2014) (citation omitted).

## 1.   False Statement in Writing

For a debt to be nondischargeable under section 523(a)(2)(B), a creditor must prove that the debtor obtained money by (1) use of a statement in writing that was materially false; (2) that pertained to his or his business's financial condition; (3) on which the plaintiff reasonably relied; and (4) that the debtor made with the intent to deceive the plaintiff. Bank of Neb. v. Rose (In re Rose), 483 B.R. 540, 543–44 (B.A.P. 8th Cir. 2012).

The parties do not dispute that Debtor's 2013 balance sheet and executive summary were written statements regarding his financial condition.[31]

### a.   Materiality

"A written statement is materially false if it paints a substantially untruthful picture of the debtor's financial condition by misrepresenting information that would normally affect the lender's decision to extend credit." In re Lindsey, 443 B.R. at 813 (citation omitted). Debtor's 2013 balance sheet listed $50,000 in miscellaneous tools and two welders that Debtor did not own. It also included a Cessna plane valued at $2,500, three antique tractors valued at $8,000 each and a fourth tractor valued at $4,500, all of which Debtor no longer owned. The balance sheet also included a $40,000 account receivable from Darin Weisz but did not include an account payable Debtor owed to Weisz. In addition, the balance sheet listed a rental house valued at $35,000 but did not include the liability against it.[32]

Horizon asserts Debtor's 2013 balance sheet was materially false because it included the inaccurate information listed above and overstated Debtor's net worth by $163,500.[33] Debtor argues that it was not materially false because $163,500 in assets, measured against Debtor's total assets of $3,744,745, is a discrepancy of only 4.35 percent. Debtor further asserts there was no evidence that Horizon would not have

---

[31] Horizon does not list any specific misrepresentations on the executive summary. Horizon refers to Debtor's "financial statement" in its allegations under section 523(a)(2)(B). Since the document is titled, "Balance Sheet," the Court refers to P-209, P-210 and P-211 as balance sheets.

[32] Horizon does not list the alleged crop inventory discrepancies as grounds for its section 523(a)(2)(B) claim or include it in its list of balance sheet deficiencies.

[33] Horizon does not specify the omissions that comprise this total.

made the loan if Debtor's assets were only $3,581,245 rather than $3,744,745. The balance sheet painted a substantially untruthful picture of Debtor's financial condition. Further, Anderson testified that he would not have submitted the loan to the loan committee for approval if he had known Debtor's balance sheet included false information. Foster testified that the inaccuracies on Debtor's balance sheet were material because they reflected a more favorable financial condition. The Court concludes that Debtor's 2013 balance sheet was materially false.

b.    Reasonable Reliance

Horizon must demonstrate that it actually relied on the false financial statements and that its reliance was reasonable under the circumstances. Fleming Mfg. Co, Inc. v. Keogh (In re Keogh), 509 B.R. 915, 932 (Bankr. E.D. Mo. 2014) (citation omitted). "Partial reliance is all that is necessary; the financial statement need only be a contributing cause to the decision to extend credit." Hous. Auth. of St. Louis Cty. v. White (In re White), 472 B.R. 883, 887 (Bankr. E.D. Mo. 2011) (citation omitted). Courts consider the totality of the circumstances in determining reasonable reliance. In re Rose, 483 B.R. at 544. "The court may consider if there were any 'red flags' that would have alerted the creditor to the possibility that the financial statement was not accurate and whether minimal investigation would have revealed the inaccuracy." In re Keogh, 509 B.R. at 932 (citing First Nat'l Bank of Olathe v. Pontow (In re Pontow), 111 F.3d 604, 610 (8th Cir. 1997)).

In this case, Horizon would not have granted Debtor the loan unless both the loan committee and the board of directors approved it. Horizon's loan policies require their approval. Their reliance is therefore at issue. There is no credible evidence that any of the members of the loan committee or board of directors actually relied on—or

even looked at—Debtor's 2013 balance sheet.  Not one of Horizon's employees who testified at trial could remember anything about considering, discussing or approving Debtor's loan.

Likewise, Anderson could not recall any details about pre-meeting telephone calls.  He claimed that he "would have" called to obtain approval from a quorum of the loan committee and the board of directors ahead of their respective meeting dates so that Debtor's loan could be "booked."  He could not recall specifically making any calls or any details about the calls.  There is no documentation of telephone calls or any evidence from any loan committee member or director that he actually did so.  The only evidence that Anderson made the calls is the generic entry on the comment sheet in which Anderson wrote, "I did approve this loan through loan committee and board."

Even if the Court assumes Anderson contacted the requisite committee and board members and received advanced approval, there is no evidence that their decision was based on Debtor's written representations regarding his financial situation. There is simply no evidence that the loan committee or board members read, much less actually relied on, Debtor's financial statements in approving his loan except testimony regarding routine practice.  While the loan committee minutes indicate that Debtor's loan was on the agenda, this reference is the only documentary evidence that the loan committee considered or approved his loan.  Witnesses testified that Horizon's practice was to record only those loans that the loan committee disapproved in the minutes. While this may be true, the practice is contrary to their own loan policies.  It also leaves Horizon in a position in which it cannot show that the loan committee approved the loan, much less substantiate the basis for making its decision.

Because Horizon failed to document Debtor's loan approval process and none of its loan committee members or directors could remember details about it, Horizon relies entirely on testimony regarding Horizon's routine practices and its employees' habits under Federal Rule of Evidence 406. Specifically, Anderson, Vollmer, Foster and Hornstein testified that they always rely on a borrower's balance sheet when they consider a new line of credit. Horizon asserts that this routine practice establishes that they relied on Debtor's balance sheet when they considered approving his loan. Although the Court overruled objections to the admissibility of this evidence, this testimony does not definitively establish actual reliance. See Burchfield v. CSX Transp., Inc., 2009 WL 1405144, at *4 (N.D. Ga. May 15, 2009) ("Ultimately, habit evidence is to be 'weighed and considered by the trier of fact in the same manner as any other type of direct or circumstantial evidence.'") (quoting Loughan v. Firestone Tire & Rubber Co., 749 F.2d 1519, 1523 (11th Cir. 1985); see also U.S. v. Davis, 261 F.3d 1, 33 n.24 (1st Cir. 2001) ("Once routine practice evidence has been admitted, Rule 406 does not limit the district court's consideration of such evidence, or the weight that it may be given"). To the contrary, the Court finds their testimony, without more, lacks credibility and is unpersuasive.

It is even more apparent that the board of directors did not rely on the balance sheet. The board of directors' meeting minutes from the day it allegedly approved Debtor's loan did not list Debtor's loan request, even though the minutes listed other new loans. This suggests that Debtor's loan was not considered for approval. Even if the board considered Debtor's loan, it appears the members approved it without access to Debtor's financial information. The board members did not have access to FINPACK,

and there was no evidence regarding an alternative method for providing borrowers'

financial documents to board members for their review.  In a post-trial brief, Horizon

conceded that the board "simply provide[s] general oversight" and that its function is not

to "analyze each and every piece of information already considered."  Doc. 60.  This

concession, together with the lack of evidence showing any board member viewed the

balance sheet, shows lack of reliance.

Further, Debtor's loan was "booked" on February 6, 2013, after which he was

granted access to funds.  Given the lack of evidence regarding whether the telephone

calls were made—or the substance of them—the Court is not convinced that a quorum

of board members granted preliminary approval based on their review of any financial

information.  The meeting at which the board purportedly granted formal approval of

Debtor's loan was in March 2013, suggesting board approval was just a formality.

Accordingly, the Court finds that the board of directors did not rely on Debtor's 2013

balance sheet in approving his loan.  Considering all of these circumstances, Horizon

did not meet its burden of proving, by a preponderance of the evidence, that the loan

committee and the board of directors actually relied on Debtor's balance sheet.

Horizon also failed to prove that its alleged reliance on Debtor's 2013 balance

sheet was reasonable.  Minimal investigation would have revealed the discrepancies in

crop inventory, inaccuracies in farm machinery, equipment and tools and Debtor's lack

of working capital.  Anderson never inspected Horizon's collateral at Debtor's farm

despite the Horizon loan policy requirement to do so.  Anderson testified that he drove

by Debtor's farm, but the Court is not convinced that driving by the farm is sufficient to

verify Debtor's equipment and crop inventory.  Additionally, Horizon neither obtained an

updated credit report or lien search, nor required Debtor to provide his most recent tax

returns.  Horizon's inattentiveness to its policies and standard practices of obtaining

credit reports, UCC searches, tax returns and accurate budget information; verifying

collateral; analyzing budget information, historical data and credit factors to determine

credit risk;  and questioning Debtor's recent overdraft(s) and past-due loans before

granting the 2013 operating loan or considering loan extensions all point to one

conclusion:  Horizon relied on its 20-year banking relationship with Debtor, his

reputation for good farming practices and his credit history with the bank—not Debtor's

2013 balance sheet.  Accordingly, the Court finds that Horizon did not reasonably rely

on Debtor's false representations.

c.     <u>Intent to Deceive</u>

In its post-trial brief, Horizon does not address how it established Debtor's intent

to deceive.  Although the Court need not reach the issue because Horizon's claim under

section 523(a)(2)(B) fails under the reliance element, the Court notes that it is not

convinced that Debtor acted with an intent to deceive Horizon.

In examining the record in its entirety, the Court concludes that Horizon has not

established every element under 11 U.S.C. § 523(a)(2)(B) by a preponderance of

evidence.  Accordingly, Horizon's request that Debtor's debt be excepted from

discharge under section 523(a)(2)(B) is denied.

**2.     Willful and Malicious Injury**

Horizon claims Debtor willfully and maliciously converted Horizon's collateral.

Specifically, it asserts Debtor converted farm machinery when he sold the header in

2012.  It claims that instead of remitting the sale of the proceeds of its collateral, Debtor

deposited the money into his account at another bank and spent it.  It also claims

56

Debtor converted the bat-wing mower and anhydrous applicator by transferring his half-interest in them to Weisz.  In addition, it claims Debtor converted the cultivator and spreader by transferring them to Miller to offset his debts for services Miller provided.  It claims Debtor also converted Horizon's collateral by purchasing the Toro mower and transferring it to Amy Lee.  Finally, Horizon claims Debtor refuses to turn over the Joyner 4x4 ATV to Horizon even though it is Horizon's collateral.

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).  Section 523(a)(6) first requires the court to determine "exactly what injury the debt is for." Blocker v. Patch (In re Patch), 526 F.3d 1176, 1181 (8th Cir. 2008). Next, the court must determine whether the debtor both willfully and maliciously caused the injury. Id.  "It is well established in the Eighth Circuit that the elements of 'malice' and 'willfulness' must be separately analyzed."  Sailor Music v. Walker (In re Walker), 514 B.R. 585, 589 (B.A.P. 8th Cir. 2014) (citations omitted). The party seeking to avoid the discharge of the debt bears the burden of proving, by a preponderance of the evidence, that the section 523(a)(6) exception to discharge applies.  Hidy v. Bullard (In re Bullard), 449 B.R. 379, 384 (B.A.P. 8th Cir. 2011 (citation omitted).  Thus, Horizon must prove an injury occurred and that it was "willful" and "malicious" by a preponderance of the evidence.

To find an injury, section 523(a)(6) requires the "invasion of the legal rights of another, because the word 'injury' usually connotes legal injury (injuria) in the technical sense, not simply harm to a person." Geiger v. Kawaauhau (In re Geiger), 113 F.3d 848, 852 (8th Cir. 1997).  Horizon's collateral included Debtor's equipment and deposit

accounts.  Debtor's disposition of Horizon's collateral, and his use of Horizon's cash

collateral to purchase the Toro mower he gave to Amy Lee, violated the security

agreement and injured Horizon.  Horizon, therefore, proved it sustained an injury as a

result of the transfers and the acts it listed, with one exception.  It did not establish injury

as a result of Debtor's alleged refusal to turn over the ATV to Horizon.  Debtor listed the

ATV in his petition, and Horizon may repossess it.

Next, the Court must determine whether Debtor willfully and maliciously injured

Horizon.  The Bankruptcy Appellate Panel for the Eighth Circuit explained the malice

and willfulness elements as follows:

> "The word 'willful' in (a)(6) modifies the word 'injury,' indicating that
> nondischargeability takes a deliberate or intentional injury, not merely a
> deliberate or intentional act that leads to injury . . ." Kawaauhau v. Geiger,
> 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).  The "willful" element
> is a subjective one.  Blocker v. Patch (In re Patch), 526 F.3d 1176, 1180
> (8th Cir. 2008).  "If the debtor knows that the consequences are certain, or
> substantially certain, to result from his conduct, the debtor is treated as if he
> had, in fact, desired to produce those consequence[s]."  Id.

> Malice requires more than just reckless behavior by the debtor.
> Scarborough, 171 F.3d at 641 (citing In re Miera, 926 F.2d at 743).  The
> defendant must have acted with the intent to harm, rather than merely acting
> intentionally in a way that resulted in harm.  Id.  "Circumstantial evidence of
> the debtor's state of mind [can] be used to ascertain whether malice
> existed."  In re Fors, 259 B.R. at 139 (quoting In re Miera, 926 F.2d at 744).

In re Porter, 375 B.R. at 828.  Further, "malice requires conduct more culpable than that

which is in reckless disregard of the creditor's economic interests and expectancies."

Johnson v. Logue (In re Logue), 294 B.R. 56, 63 (B.A.P. 8th Cir. 2003) (citations

omitted).  "The debtor's knowledge that he or she is violating the creditor's legal rights is

insufficient to establish malice absent some additional aggravated circumstances.

Conduct which is certain or almost certain to cause financial harm to the creditor is

required." Id. (citations omitted). Finally, "[w]hile intentional harm may be difficult to establish, the likelihood of harm in an objective sense may be considered in evaluating intent." Id. (citation omitted).

When Debtor received the $8,000 in October or November 2014 for the header he sold in 2012, he deposited the money into an account at Bremer Bank.  At that time, Debtor knew that the auction sale proceeds were insufficient to pay his debt to Horizon. He used the $8,000 for personal expenses, including paying his bankruptcy attorney because he had no other funds.  While it is clear that Debtor intended to commit the act (spending the money) that led to Horizon's injury, there is no evidence that he intended to injure Horizon.  To the contrary, Debtor testified he used the $8,000 without any intent to harm Horizon; rather, he spent it intending only to pay his necessary expenses. The Court finds his testimony credible.

Further, Horizon was aware that Debtor "jockeyed" equipment throughout most, if not all, of its lending relationship with him.  Anderson testified that equipment sale proceeds were typically applied to Debtor's loan but that sometimes he let Debtor keep them or buy new equipment with them.  There is no evidence that Horizon ever penalized Debtor for the practice or told him to discontinue it.  This fact further undermines Horizon's contention that Debtor kept the money from the sale of the header with an intent to injure Horizon and, instead, demonstrates an established practice and understanding between Debtor and Horizon.

As for Debtor's transfers of his interests in equipment to offset his debts to Weisz and Miller, the Court is again not convinced Debtor intended to injure Horizon.  He had a long-standing history of swapping services and equipment with each of these men.

59

His intent was to settle his debts in a manner that was efficient and practical, and not to harm Horizon.

With regard to Debtor's purchase of the Toro mower and transfer of it to Amy Lee, the Court is likewise not convinced Debtor transferred the mower with an intent to injure Horizon. Debtor transferred the mower with the intent to compensate her for unpaid rent. He transferred the mower before the equipment auction, which he believed would generate proceeds sufficient to repay Horizon in full. This is further support that he did not intend to harm Horizon.

Horizon showed only that Debtor intended the acts that led to the injury to Horizon, but not that Debtor specifically intended the injury or harm. Therefore, Debtor did not commit a willful injury under section 523(a)(6).

Section 523(a)(6) requires willful and malicious injury to except a debt from discharge. Therefore, the Court's finding that the injury was not willful disposes the issue of whether the debt may be discharged. Even if the Court found that the injury was willful, however, the debt is still dischargeable because the same facts demonstrate that the Debtor did not act with malice.

Moreover, there is no evidence that Debtor intended or fully expected to harm Horizon's economic interests. Although he violated Horizon's legal interest, there are no aggravating circumstances. Debtor did not act with malice and did not intend or expect to harm Horizon.

Accordingly, Horizon did not prove that Debtor willfully and maliciously injured it, and section 523(a)(6) therefore does not provide a basis for the denial of Debtor's discharge.

**III.    CONCLUSION**

The Court considered all other arguments and deems them to be without merit.

For the reasons stated above, it is **ORDERED** that Horizon's claims and causes

of action under 11 U.S.C. § 523(a)(2) and (a)(6) and 11 U.S.C. § 727(a)(2), (a)(3) and

(a)(4) are dismissed with prejudice.

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated April 29, 2016.

_____/s/ SHON HASTINGS_____
SHON HASTINGS, JUDGE
UNITED STATES BANKRUPTCY COURT